**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| THERMAL TECHNOLOGIES, INC., | ) | |
| On Behalf of Itself and All Others Similarly | ) | |
| Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 08-CV- 102-GKF-FHM |
| vs. | ) | |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**O P I N I O N   A N D   O R D E R**

This matter comes before the court on the Motion to Dismiss Under Fed.R.Civ.P.

12(b)(6) of defendant, United Parcel Service, Inc. ("UPS") [Document No.16].  For the reasons

set forth below, defendant's motion is granted.

This is a putative class action for alleged unlawful tying and monopolization in violation

of the Sherman Act and unjust enrichment.  Plaintiff, Thermal Technologies, Inc., ("Thermal"),

claims UPS has unlawfully tied or bundled the sale of its ground parcel shipping service for

parcels valued at up to $100 within the United States to the purchase by the customer of

insurance coverage from UPS for that shipment.  Defendant contends the Complaint, on its face,

fails to state a cause of action under the Sherman Act because, as a matter of law, the protection

against loss or damage up to $100 per package is a limitation on liability rather than insurance.

Defendant also contends plaintiff's common law claim for unjust enrichment is pre-empted by

the Federal Aviation Administration Authorization Act.

### I. Plaintiff's Allegations

Plaintiff alleges it has used UPS for the ground shipment within the United States of

parcels valued up to $100, and has been forced to pay a bundled price for shipment that also included a sale of insurance coverage by UPS for the shipment. [Document No. 2, ¶2].  It contends that UPS is the market leader in shipment via ground shipping of parcels, with a market share in excess of 70 percent. [*Id.,* ¶3].  Plaintiff alleges that UPS uses and exploits this market power to force customers who ship parcels via ground shipping with UPS to also obtain insurance coverage for those shipments from UPS, regardless of whether the customer desires to obtain such insurance coverage at all, or whether the customer would prefer to obtain such coverage from a different provider. [*Id.*]

Plaintiff contends that for purposes of the Complaint, there are two relevant product markets. [*Id.,* ¶9].  The tying market, it claims, consists of the product market for ground shipment of packages or parcels within the United States. [*Id.*] The tied market consists of the product market for insurance for such ground shipments within the United States. [*Id.*]   For shipped items valued at more than $100, UPS sells its ground shipping services and insurance offerings separately and on an unbundled basis. [*Id.,* ¶18].  When the shipped items have a value of up to $100, however, UPS bundles the shipping and insurance offerings together, requiring customers to obtain insurance from UPS if the items they ground ship with UPS have a value of up to $100. [*Id.*] The UPS Tariff/Terms and Conditions of Service For Small Package Shipments in the United States, attached as Exhibit 1 to the Complaint, provides:

**G. Limitations of Liability**

1.  Each UPS domestic package or international shipment is automatically protected by UPS for loss and damage up to a value of $100.  Unless a greater value is recorded in the declared value field of the UPS source document or the UPS shipping system used, the shipper agrees that the released value of each domestic package or international shipment is no greater than $100.00, which is a reasonable value under the circumstances surrounding the transportation, and that

UPS shall not be liable for more than $100 for each domestic package or international shipment.

2.  If additional protection is desired, the shipper may declare a value in excess of $100, subject to the maximum allowable limits, by showing a value in excess of $100 in the declared value field of the UPS source document or the UPS shipping system used.  An additional charge as set forth in the UPS Rates in effect at the time of shipping will be assessed.  UPS shall not be liable under any circumstances for an amount in excess of the declared value of a domestic package or international shipment.  When a shipper declares a value in excess of  $100, it does not receive any form of insurance.  Shippers desiring cargo insurance, all risk insurance, or another form of insurance should purchase such insurance from a third party.

[*Id.,* Ex. 1, VI §G].  The second quoted sentence of §G.1, plaintiff contends, is a limitation on liability, and the first sentence is "an assertion by UPS that insurance protection is 'automatically' provided for shipments valued at up to $100.00." [*Id.,* ¶22].  Plaintiff alleges that as a result of the unlawful tying,  it and members of the putative class have been forced to obtain an insurance product that they did not want or would have preferred to obtain from a source other than UPS. [*Id.* ¶26].  Even if, in the absence of UPS's forced tie or bundling, plaintiff and class members would still have opted to obtain both shipment and insurance coverage from UPS for items valued at up to $100, in a competitive market devoid of defendant's forced tie, UPS would not be able to unlawfully force consumers to overpay for these serves, such that plaintiff and all class members would have been able to make the same purchases from UPS at lower prices.  [*Id.*] Plaintiff asserts claims for unlawful tying/bundling in violation of 15 U.S.C. §1, unlawful monopoly in violation of 15 U.S.C. §2, and unjust enrichment. [*Id.* ¶¶33-48].

## II.  Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The United States

Supreme Court recently clarified this standard in *Bell Atlantic Corp. v. Twombly*, ruling that to

withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a

claim to relief that is plausible on its face." ___U.S.___,___, 127 S.Ct. 1955, 1974, 167 L.Ed.2d

929 (2007). "The costs of modern federal antitrust litigation and the increasing caseload of the

federal courts counsel against sending the parties into discovery when there is no reasonable

likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Id.*

at 1967. Under the *Twombly* standard, "the complaint must give the court reason to believe that

*this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Robbins*

*v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008), quoting *Ridge at Red Hawk, L.L.C. v.*

*Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original). "The burden is on the

plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she

is entitled to relief." *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1965 (internal

quotations omitted). "Factual allegations must be enough to raise a right to relief above the

speculative level." *Id*.

The Tenth Circuit Court of Appeals has interpreted the *Twombly* standard as a middle

ground between "heightened fact pleading," which is expressly rejected, and complaints that are

no more than "labels and conclusions," which courts should not allow. *Robbins*, 519 F.3d at

1247, citing *Twombly*, 127 S.Ct. at 1964, 1965, 1974. Accepting the allegations as true, they

must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief.

*Robbins*, 519 F.3d at 1247. "This requirement of plausibility serves not only to weed out claims

that do not (in the absence of additional allegations) have a reasonable prospect of success, but

also to inform the defendants of the actual grounds of the claim against them." *Id*. at 1248.

4

The Tenth Circuit Court of Appeals instructed in *Robbins* that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context. . . .[and] the type of case." *Id*. (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008)). A complaint dealing with a more complex matter, as in an antitrust action, will be more extended and may require more particularity. *Mountain View Pharmacy v. Abbott Laboratories,* 630 F.2d 1383, 1387 (10th Cir. 1980).

Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss. *Tal. v. Hogan,* 453 F.3d 1244, 1265 (10th Cir. 2006). Conclusory allegations of violation of the antitrust laws are not sufficient to state a claim and must be supported by well-pleaded factual allegations. *Med. Supply Chain v. Gen. Elec. Co.*, 144 Fed.Appx.708, 713 (10th Cir. 2005).  Moreover, the court is not bound to accept as true legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286 (1986).

### III. Analysis

### A.  Antitrust Claims

A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product. *Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451, 462, 112 S.Ct. 2072 (1992).  Tying arrangements are unlawful because they deny competitive access to the tied product market on the basis of the seller's leverage in the tying product market, and force buyers to forego free choice between sellers. *Abraham v. Intermountain Health Care Inc.,* 461 F.3d 1249, 1264 (10th Cir. 2006). Three elements are necessary to state a tying claim: (i) purchases of the tying product must be conditioned upon purchases of a distinct tied product; (ii) a seller must possess sufficient power

in the tying market to compel acceptance of the tied product; and (iii) the tying arrangement must foreclose to competitors of the tied product a "not insubstantial" volume of commerce. *Continental Trend Resources, Inc. v. Oxy USA, Inc.,* 44 F.3d 1465, 1481 (10th Cir. 1995). Plaintiff's claim under Section 2 of the Sherman Act is premised on the same facts as the Section 1 claim, and thus also must meet the same requirements.

To establish the first element–*i.e.*, purchases of the tying product must be conditioned upon purchases of a distinct tied product–plaintiff must allege the existence of two separate products. *Jefferson Parish v. Hyde,* 466 U.S. 2, 21, 104 S.Ct. 1551 (1984).  Here, the Complaint alleges that the tying product is the product market for ground shipment of parcels in the United States and the tied product is the product market for insurance for these shipped parcels.

The issue, then, is whether the ground shipment service is a separate product from the $100 of "protection" provided by UPS.   The resolution of this issue, in turn, hinges on the question of whether the language of the tariff creates a contract of insurance or is merely a limitation on the liability of UPS.  None of the authority cited by either party addresses the precise issue before the court–that is, whether, in the context of antitrust law, the $100 "protection" language in the UPS tariff is insurance or in any manner a separate product. However, an examination of the history of carrier liability is instructive.

Historically, common law imposed on carriers near strict  liability for loss or damage to a shipper's goods.  *Adams Express v. Croniger,* 226 U.S. 491, 509, 33 S.Ct. 148 (1913).  Under the common law, a carrier, though not an absolute insurer, was liable for damage to goods it transported unless it could show that the damage was caused by the act of God, a public enemy, the act of the shipper himself, public authority or the inherent vice or the nature of the goods.

6

*Skaggs v. Midland Valley Railroad Company,* 233 F.Supp. 1004, 1006 (N.D.Okla. 1964).

Furthermore, the carrier was liable for the full value of the loss incurred by the shipper.  *Ensco,*

*Inc. v. Warren Jaycox,* 689 F.2d 921, 925 (10th Cir. 1982).  Because of the level of liability

imposed, the common law recognized the carrier's right to limit liability through any agreement

that did not exempt against the negligence of the carrier itself.  *Adams Express,* 226 U.S. at 509.

Moreover, carriers were also entitled to charge a higher rate to compensate for the greater risk,

and common law recognized the additional charge was part of the transportation rate.  *Id.*  As the

court reasoned:

> ...a carrier may, by a fair, open, just, and reasonable agreement, limit the amount
> recoverable by a shipper in case of loss or damage to an agreed value, made for
> the purpose of obtaining the lower of two or more rates of charges proportionated
> to the amount of risk.

*Id.* at 509-510.  So-called "released rate" structures have been enforced because they benefit

shippers and carriers alike by cheapening freight and securing the carriage.  *Hart v. Pennsylvania*

*Railroad Company,* 112 U.S. 331, 340, 3 S.Ct. 151 (1884).  "The subject-matter of a contract

may be valued, or the damages in case of a breach may be liquidated, in advance."  *Id.* At 341.

The common law concerning liability of carriers is codified in the Carmack Amendment

to the Interstate Commerce Act, 49 U.S.C. §14706.  The Carmack Amendment imposes absolute

liability on carriers for actual loss or injury to the property transported in the United States.  49

U.S.C. §14706(a)(1).  However, the Act also allows carriers to:

> ...establish rates for the transportation of property... under which the liability
> of the carrier for such property is limited to a value established by written
> or electronic declaration of the shipper or by written agreement between
> the carrier and the shipper if that value would be reasonable under the
> circumstances surrounding the transportation.

49 U.S.C. §14706(c)(1)(A).

> The Tenth Circuit has stated:
>
> The Carmack Amendment to the Interstate Commerce Act imposes absolute
> liability upon carriers for all loss or injury to the property caused by the
> carrier...However....a carrier may limit its liability by taking four steps: (1) maintain a
> tariff within the prescribed guidelines of the Interstate Commerce Commission;
> (2) obtain the shipper's agreement as to his choice of liability; (3) give the
> shipper a reasonable opportunity to choose between two or more levels of
> liability; and (4) issue a receipt or bill of lading prior to moving the shipment.

*Norton v. Jim Phillips Horse Transportation,* 901 F.2d 821, 827 (10th Cir. 1989) (*citations*

*omitted).*

Read in the context of common and statutory law, defendant's Tariff/Terms and

Conditions appear to do precisely what was previously permitted by common law and is now

allowed by the Carmack Amendment: impose a limitation on the carrier's liability for goods

damaged in shipment.  The tariff states:

> Each UPS domestic package or international shipment is automatically protected
> by UPS for loss or damage up to a value of $100.  Unless a greater value is
> recorded in the declared value field of the UPS source document or the UPS
> shipping system used, the shipper agrees that the released value of each domestic
> package or international shipment is no greater than $100, which is a
> reasonable value under the circumstances surrounding the transportation, and
> that UPS shall not be liable for more than $100 for each domestic package or
> international shipment.

[Document No. 1, Ex. 1, §G.1].  Absent the limiting language, the defendant would be liable

under the Carmack Amendment for the full value of the loss.  These two sentences, read

together, simply establish a $100 limit.  The court does not believe the language creates a

separate contract of insurance.

Plaintiff relies on three cases which make passing reference to the UPS protection on

packages valued at up to $100 as "insurance."  However, whether the protection is, as a legal

matter, "insurance," was not the focus in any of the cases.  For example, in n *EVIC Class Action Litig.,* 2002 WL 1766554 (S.D.N.Y. 2002), the court evaluated a claim that UPS's  insurance for coverage of parcels valued *in excess* of $100 was unlawfully tied to its shipping service.  The court, while addressing this issue, stated, "...insurance coverage of up to $100.00 is included in the price for shipping any items via UPS." *Id.* at *8.  *Beaver Express Service, Inc. v. Railroad Commission of Texas,* 727 S.W.2d 768 (Tex. 1987) involved the judicial review of a final order of the Railroad Commission issuing a certificate of public convenience and necessity to UPS. Appellants, competing carriers of UPS,  had challenged the adequacy of the Commission's findings of fact.  The court, in rejecting this challenged, recited all of the Commission's findings of fact.  One of the findings of fact concerning characteristics of UPS service was "[a]utomatic insurance coverage of $100 per package against loss and damage with unlimited additional coverage available..." *Id.* at 777.  *Hammett v. New Orleans Diamond and Jewelry Wholesalers, Inc.,* 580 So.2d 1077 (La.Ct.App. 1991), was a suit by jewelry owners against, *inter alia,* a jewelry repair shop for damages caused when the jewelry was lost during shipment.  The shop had used UPS to ship jewelry to New York for repair.  In discussing the loss, the court stated, "The evidence reveals that U.P.S. insures items up to $100.00 in value, and that customers must secure additional insurance for more expensive items." *Id.* at 1081.  None of these cases involves a dispute about whether the $100 protection was actually "insurance" in the legal sense or whether the protection was a separate product from the shipping service.

Defendant has cited authority in support of the proposition that a limitation on liability or acceptance of a certain level of liability does not constitute "insurance."  In *White v. United Van Lines, Inc.,* 758 F.Supp. 1240 (N.D.Il. 1991) the court rejected plaintiff's claim against a moving

9

company for breach of an "insurance contract," stating:

> Plaintiff mischaracterizes the "Gold Umbrella" certificate as an "insurance policy."  The certificate is simply a modification of the carrier's standard liability limits under the bill of lading.  The "Gold Umbrella" plan permits the shipper to purchase a higher liability limit based on the shipper's valuation of the shipment.

*Id.* at 1243, n. 4.

The court in *Tayssoun Transportation, Inc., v. Universal Am-Can, Ltd.,* 2005 U.S.Dist. LEXIS 41093 (S.D.Tex. 2005), was faced with the question of whether a  Contractor Operator Agreement between Tayssoun, an "owner-operator" of a fleet of trucks and related equipment, and UACL, an interstate motor carrier, constituted an agreement by UACL to act as an insurer for Tayssoum.  Under the Agreement, UACL paid Tayssoun to pick up, haul and deliver its cargo.  UACL charged Tayssoun a $5 per trip fee for "cargo insurance," but kept the fees in a cargo claims account for its own purposes, namely to offset claims on cargo shipped by Tayssoun. *Id.* at *32; Tayssoun argued, after termination of the contract, that UACL was an "insurer" for purposes of the Texas Insurance Code. *Id.* at *26.  The court, in evaluating this claim, stated:

> Usually, an insurer pays indemnity to the insured for losses but is not a primary actor in the activity being insured.  Here, UACL controlled the equipment and was directly "responsible" to third parties "for operation of the equipment."  It was UACL that had the business relationship with the shippers; shippers were required to assert their cargo claims against UACL; and UACL paid shippers' claims arising from Tayssoun's conduct hauling loads.  The shipper/UACL relationship was required by federal law.  Thus, the claims in question were asserted by shippers against UACL; UACL was not paying indemnity for claims shippers asserted against Tayssoun.

*Id.* at *32-33.   The court noted other "indicia of an insurance contract relationship" were missing from the Agreement:

> There was no insurance contract separate from the parties' overriding Agreement

10

governing their business relationship.  There was no express definition of who
was the "insurer" and who was the "insured."  UACL, a company certified as an
interstate carrier of cargo, is not primarily in the insurance business.  Tayssoun
does not argue there is any spreading and underwriting of a policyholder's risk.
Even Tayssoun's insurance expert has admitted that the Agreement is not an
insurance policy.  In sum, the Agreement allocated responsibility for cargo loss
between the parties.  Despite langauge suggestive of insurance in the Agreement,
the Court is unpersuaded that UACL contracted to be Tayssoun's insurer for
cargo damage.  Moreover, contrary to Tayssoun's assertion, the Agreement on
its face lacked similarity to a legitimate insurance policy and thus the alleged
misrepresentations are not wrongs addressed by the Texas Insurance Code.

*Id.* at *34-35.  *(Citations omitted.)*  A similar analysis was made in an opinion issued by the New

York General Counsel concerning whether the UPS $100 protection constituted "insurance."

New York General Counsel Opinion 8-15-94 (#1)(August 15, 1994).   In answering the question

in the negative, the opinion stated:

> New York State Insurance Law §1101(a)(1) defines an insurance contract
> as: any agreement or other transaction whereby one party the 'insurer', is
> obligated to confer a benefit of pecuniary value upon another party, the
> 'Insured' or 'beneficiary' dependent on the happening of a FORTUITOUS
> EVENT in which the insured or the beneficiary has, or is expected to have
> at the time of such happening a material interest which will be adversely
> affected by the happening of such event.
>
> Section 1101(a)(2) defines fortuitous event as, "any occurrence or failure
> to occur which is, or is assumed by the parties to be, to a substantial extent
> beyond the control of either party."
>
> UPS as the shipper retains control over the package throughout the
> delivery process.  Loss or damage to the package is not an occurrence
> which is 'beyond its control'.  Accordingly, any loss or damage would
> not be considered a fortuitous event under New York Law.  In addition,
> company's obligation to pay the first $100 of loss is imposed by the rules
> and regulations of the Interstate Commerce Commission.

In *Prince v. United Van Lines, Inc.,* 1997 U.S.Dist. LEXIS 23702 (February 4, 1997), the

court rejected a claim by plaintiffs that the moving company had engaged in conduct that

11

violated Texas insurance laws and the "unauthorized practice of proving insurance in violation

of state law." *Id.* at *6.  The court held that "...the contractual limit of liability provided by

United is a creature of the Carmack Amendment itself and therefore it cannot be, and never has

been, considered insurance by the federal courts such the the pre-emptive effects of the

Amendment would give way to state insurance regulations. *Id.* at *7.

Finally, the Tenth Circuit, in *Underwriters at Lloyds of London v. North American Van

Lines,* 890 F.2d 1112 (10th Cir. 1989), examined the issue of whether language in the carrier's

tariff constituted insurance or a limitation of liability.  In *Underwriters*, Robert and Lucinda

Chapman engaged North American to move their household goods from Denver to Houston.

The Chapmans, acting with the professional advice of a consultant, opted to insure their goods

separately with Lloyds and signed up for North American's cheapest freight charge. *Id.* at 1114.

The bill of lading signed by the Chapmans contained the following language:

> "VALUATION STATEMENT
>
> UNLESS THE SHIPPER EXPRESSLY RELEASES THE SHIPMENT TO A
> VALUE OF 60 CENTS PER POUND PER ARTICLE, THE FORWARDER'S
> MAXIMUM LIABILITY FOR LOSS AND DAMAGE SHALL BE EITHER
> THEM LUMP SUM VALUE DECLARED BY THE SHIPPER OR AN AMOUNT
> EQUAL TO $1.25 FOR EACH POUND OF WEIGHT IN THE SHIPMENT,
> WHICHEVER IS GREATER.
>
> THE SHIPMENT WILL MOVE SUBJECT TO THE RULES AND CONDITIONS
> OF THE FORWARDER'S TARIFF.  SHIPPER HEREBY RELEASES THE
> ENTIRE SHIPMENT TO A VALUE NOT EXCEEDING: *$.60 per lb.*"

*Id.* at 1113-14.   In the course of the shipment, the Chapmans' goods were destroyed or damaged

by fire.  Lloyds paid on the insurance policy and thereafter, asserted subrogation rights against

North American for the entire amount of the loss, alleging common law negligence against the

moving company.  The court rejected Lloyd's claim, holding North American was only liable for

12

the released rate.  In so ruling, the court commented:

> As the district court found, the bill of lading, completed and signed by the
> Chapmans, clearly and unambiguously limited North American's liability
> for loss and damage to the Chapmans' household goods to $.60 per pound.
> The Chapmans knowledgeably bargained for the limitation and the corresponding
> freight rate.  There was full equality of bargaining power, especially considering
> the professional consultants who advised the Chapmans in their dealings
> with North American.  There is not the slightest indication that the bargained-
> for limitation on North American's liability was understood by the parties
> to be less than a blanket limitation covering all forms of action against North
> American for loss or damage to the Chapmans' goods.

*Id.* at 1114.  The court also noted:

> As permitted by the Interstate Commerce Commission, and in accordance with its
> filed tariff, North American's charge for transporting the Chapman's goods depended
> upon the extent of the liability it assumed for loss or damage.

*Id.* at 1113.

This court is convinced, based upon review of the plain language of the UPS tariff, the

history pertaining to carriers' liability case law comparing insurance versus liability limitations,

that the UPS language is a limitation on liability and not an insurance agreement.

Specifically, the language of §VI.G.1 accepts liability for loss or damage for packages up

to a value of $100.  Under the language the shipper agrees that the released value of each

package is no greater than $100, and that the UPS shall not be liable for more than $100 for each

package.  There is no reference to the words "insure" or "insurance."  There is no other "indicia"

of an insurance contract relationship, such as definitions of who is the "insurer" and who is the

"insured."  UPS is, itself, the carrier and, therefore, the "primary actor" in the activity being

covered.

The court believes the tariff is simply an agreement that allocates risk of loss between the

shipper and carrier.   Under both common law and the Carmack Amendment, the carrier may do

so, and the allocation is a valid limitation of loss.

Since plaintiff cannot establish a separate product, dismissal of the antitrust claims is appropriate.[1]

## B. Unjust Enrichment

UPS contends plaintiff's claim for unjust enrichment is preempted by the Federal Aviation Authorization Act of 1994. 49 U.S.C. §14501. That act provides, in pertinent part:

> ...a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force or and effect of law related to the price, route, or service of any motor carrier...

*Id.* §14501(c)(1). Here, plaintiff's unjust enrichment claim is based on the same conduct alleged in its illegal tying and monopolization claims and clearly relates to the price UPS charges for shipment of parcels valued at under $100. Therefore, it is preempted by the FAAA. *See Deerskin Trading Post, Inc. v. United Parcel Service of America, Inc.,* 972 F.Supp. 665, 672 (N.D.Ga. 1997).

## IV. Conclusion

For the foregoing reasons, defendant's Motion to Dismiss Under Fed.R.Civ.P. 12(b)(6) [Document No. 16] is granted.

IT IS SO ORDERED this 5th day of November, 2008.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

[1]Because the court has ruled that plaintiff has failed to state a viable antitrust claim under the Sherman Act, defendant's argument that the Released Rate Program adopted to comply with Carmack is immune from antitrust liability is not addressed herein.